1
2
3
4
5
6
7                 **UNITED STATES DISTRICT COURT**
8                 **EASTERN DISTRICT OF CALIFORNIA**
9
10

11 CORRY FLORES NAVARRO,     )  Case No.: 1:14-cv-00296-BAM
12          Plaintiff,         )
                    )  **ORDER REGARDING PLAINTIFF'S**
13     v.                 )  **SOCIAL SECURITY COMPLAINT**
                    )
14 CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security,    )
15                     )
16         Defendant.       )
                    )
17
18                        **INTRODUCTION**

19       Plaintiff Corry Flores Navarro ("Plaintiff") seeks judicial review of a final decision of the

20 Commissioner of Social Security ("Commissioner") denying his application for disability insurance

21 benefits ("DIB") pursuant to Title II of the Social Security Act and for supplemental security income

22 ("SSI") under Title XVI of the Social Security Act.  The matter is currently before the Court on the

23 parties' briefs, which were submitted, without oral argument, to Magistrate Judge Barbara A.

24 McAuliffe.  The parties consented to the jurisdiction of the Magistrate Judge.  The Court finds the

25 decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the

26 record as a whole and based upon proper legal standards.  Accordingly, this Court affirms the agency's

27 determination to deny benefits.

28 ///

///

## FACTS AND PRIOR PROCEEDINGS

On January 7, 2011, Plaintiff filed an application for disability insurance benefits and supplemental security income.  AR 210-222.[1]  Plaintiff alleged that he became disabled on June 30, 2009.  AR 9.  Plaintiff's application was denied initially and on reconsideration.  AR 128-132, 135-140.  Subsequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  ALJ Christopher Larsen held a hearing on September 27, 2012, and issued an order denying benefits on November 2, 2012.  AR 6-18.  Plaintiff sought review of the ALJ's decision, which the Appeals Council denied, making the ALJ's decision the Commissioner's final decision.  AR 1-3, 5.  This appeal followed.

### Hearing Testimony

The ALJ held a hearing on September 12, 2012, in Fresno, California.  AR 26-52.  Plaintiff appeared and testified.  AR 28.  He was represented by attorney Gina Fazio.  AR 28.  Impartial Vocational Expert ("VE") Thomas Dachelet also testified.  AR 28, 46.

Plaintiff primarily alleged disability due to problems with hypertension, and his sleep, heart, vision, depression, knees and wrists.  AR 128.  At age 31, he was 5'9' tall and weighed about 400 pounds.  His normal weight should be 180, which he last weighed as a junior in high school.  His weight is usually around 400.  AR 32.

In response to questioning from his counsel, Plaintiff testified that he graduated from high school.  He also attended a business college for medical assistant training, but only attended for eight months and did not complete the program.  AR 33.

Plaintiff last worked as a temp driving a forklift in November 2011 for approximately 9 days, but stopped because he was hearing a lot of voices.  He did not work in 2010.  In the last 15 years, he has worked as a forklift operator and performed general labor at a raisin company for three years.  He also drove a forklift at other jobs during the last fifteen years.  However, he kept hearing voices that made him paranoid.  AR 33-34.

---

[1]     References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff testified that the other physical problems keeping him from working are his vision, wrists, feet, knees, pain and arthritis.  He also has "keratoconus," an eye disease, which even with his glasses causes blurry vision.  He has problems with distance vision, but can read close up with his left eye.  Despite his vision problems, he drives during the day about two or three times a week.  He does not drive at night because he cannot see the signs.  AR 34-35.

Plaintiff has carpal tunnel in his wrists and explained that he had hard jobs in the past where he was using his wrists and arms.  If he starts using his wrists and arms now, they get numb with sharp, stabbing pains in each wrist.  It may happen when he lifts heavy things weighing about 25 pounds.  He does not have trouble opening jars with a rag or towel.  He can hold smaller things like pens and pencils, but gets numb.  He also gets numb in his hands if he is driving, so he has to stop and use them one at a time.  Plaintiff testified that he has medicine for the pain, but it does not get rid of the numbness.  He has to pull them so the blood circulates through and he gets the feeling back.  AR 35-37.

Plaintiff testified that he also will get sharp, stabbing pains in his foot, mainly on his right.  The more he moves around, walking and standing, the more pain he gets.  He also has pain when he is just sitting down.  Plaintiff believed he could walk or be on his feet about 2 hours before he would have to sit down.  His knees will start to hurt and crack, along with his ankles.  AR 35-37.

Plaintiff has been trying to lose weight, and had lost 70 pounds by eating less and walking.  He walks every three days because after walking his joints are inflamed.  Plaintiff tries to walk two hours with a cane/big staff.  He has been using a cane for two years, but it was not prescribed for him.  Plaintiff could not walk for two hours every day because of joint pain.  He would need about two days off after walking to rest his feet.  AR 37-40.  Plaintiff indicated that he can sit for a long time before he has to stand.  He also can lift about 20 pounds comfortably.  AR 46.

Plaintiff testified that he does not want to go out because the voices mess with him and he hears things every day.  He even heard something in the waiting room.  He hears things more often when he is in a group or in an area with a lot of people.  Plaintiff testified that he liked to isolate himself because he is tired of hearing "this stuff."  AR 40.  He takes medication, which helps a little bit.  AR 40.  He also takes medication for pain, but cannot mix it with his psychiatric medicine.  He

3

takes pain medication every other day or when he is walking.  He also uses Bengay and Icy Hot for pain.  AR 40-41.

When questioned about his activities of daily living, Plaintiff reported that he lives in a house with his parents and, during the day, he watches TV for about two to three hours and tries to take care of the lawn by watering it with a sprinkler.  Plaintiff also helps with some chores inside the house.  He washes his clothes, can cook and does not have a problem mopping or vacuuming.  He can take care of personal things, like dressing and bathing without help.  He does not have any hobbies and does not visit friends because of his mental illness.  Plaintiff explained that he lost all his friends and he does not go to family functions because he hears his family saying things.  Since he has been taking a pill, it does not bother him as much, and he does not hear things that wake him up.  He sleeps four to five hours a night, sometimes eight.  The medication makes it hard for him to stay awake during the day and he will pass out while watching TV.  He sleeps about three hours during the day.  He also has to put his feet up to get comfortable.  He had edema in his legs, so his mom told him it was better to put his feet up.  He probably spends about two hours a day with his feet up.  AR 41-43.

Plaintiff testified that he goes grocery shopping by himself once or twice a month.  He usually goes during the day because he thinks people know him, know all about him and he hates it.  He tries to go to church, but starts hearing things there, too.  AR 44-45.

When asked about his medications, Plaintiff reported that his schizophrenia medication makes him nervous and anxious, but he takes a side effect pill to feel a little bit better.  The painkillers put him to sleep and he cannot mix them much with the schizophrenia drug.  Plaintiff stated that the doctor said not to mix Tramadol with Geodon.  AR 45.

Following Plaintiff's testimony, the ALJ elicited testimony from the vocational expert ("VE") Thomas Dachelet.  AR 46.  The VE testified that Plaintiff's past work was classified as warehouse laborer and forklift operator, which would be performed together.  AR 47.  The ALJ asked the VE hypothetical questions, contemplating an individual of claimant's age, education, and work experience.  AR 47.  In his first hypothetical, the ALJ asked the VE to assume a worker who can lift and carry 50 pounds occasionally and 25 pounds frequently, can stand and walk for six hours in a day, can sit six hours in day, can frequently climb, balance, stoop, kneel, crouch and crawl and can

frequently reach, handle, finger and feel.  The VE testified that such an individual could perform Plaintiff's past job, along with other jobs in the economy, such as hand packager, machine packager, and laborer-poultry.  AR 48.

In a second hypothetical, the ALJ asked the VE to consider a worker who is capable of light physical exertion, but can never climb ladders, ropes, or scaffolds, can frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, and must avoid even moderate exposure to fumes, odors, dusts, gasses, and poor ventilation.  The VE stated that this worker could not perform Plaintiff's past work because of the fumes from the forklift.   However, this worker could perform other jobs in the economy, such as packing line worker, garment sorter, and ampoule filler.  AR 49.

In a third hypothetical, the ALJ asked the VE to consider a worker who can lift and carry 20 pounds occasionally, 10 pounds frequently, can stand and walk about two hours in an eight hour day, and can sit about six hours in an eight hour day, but must elevate his feet about two hours per day. This worker also can never climb ladders, ropes or scaffolds, can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, can frequently reach, handle, finger and feel, and can perform simple, repetitive tasks without public contact.  According to the VE, Plaintiff's past jobs were out and the world of work would be closed to this worker.  AR 50.

In a final hypothetical, the ALJ asked the VE to consider a worker who cannot complete an eight hour work day or a 40-hour work week without interruption from psychologically based symptoms.  The VE testified that the world of work would be closed.  AR 50-51.

**Medical Record**

The entire medical record was reviewed by the Court.  AR 361-571.  The medical evidence, summarized here, will also be referenced below as necessary to this Court's decision.

In 2007, polysomnography testing revealed severe obstructive sleep apnea and nasal CPAP titration.  It was recommended that Plaintiff consider weight loss to an ideal body weight and nasal CPAP at 17 cm of pressure.  AR 366-371.

In 2008, Plaintiff received follow-up treatment for his severe obstructive sleep apnea and morbid obesity.  AR 363-365.  In March 2008, Plaintiff was instructed to lose weight or consider possible weight reduction surgery.  On examination, he had 2+ pedal edema.  AR 363.

In June 2008, Paul Klein, PsyD, a state agency psychologist, completed a Psychiatric Review Technique and opined that Plaintiff's affective disorder (depressive sxs) was not severe.  Plaintiff had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in concentration, persistence or pace, but no repeated episodes of decompensation. AR 375-385.

Also in June 2008, Dr. Paul Frye, a state agency physician, completed a Residual Functional Capacity Assessment.  Dr. Frye opined that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and push or pull without limitation.  He could never climb a ladder, rope, or scaffolds, but had no other postural limitations.  He also had no manipulative, visual or communicative limitations, but had environmental restrictions to avoid even moderate exposure to fumes, odors, dusts, gasses, and poor ventilation.  AR 392-396.  In a case analysis, Dr. Frye noted that Plaintiff had severe obstructive sleep apnea, was super, super obese and had early signs of metabolic syndrome.  Dr. Frye opined that light work was appropriate with respiratory and postural limitations.  AR 386-387.

In July 2008, Plaintiff received follow-up treatment for his sleep apnea.  Plaintiff reported that he had been walking 2 hours every 2 days, and at least 1 hour each day.  However, during the examination, Plaintiff complained of knee pain and cracking.  AR 402.

In June 2009, Plaintiff sought follow-up treatment for his depression.  Plaintiff had been taking his Prozac, but was experiencing restlessness, especially restless legs, keeping him up at night. Plaintiff reported that his depression had been much better and he felt like he could function better on a daily basis without feeling down.  On psychiatric evaluation, Plaintiff's mood seemed elevated. Plaintiff's treating physician discontinued Prozac and started him on Sertraline.  AR 420-421.

In November 2009, Plaintiff was directed to undergo a sleep study for his sleep apnea.  AR 437.

In January 2010, Plaintiff stated that he had started taking Prozac, but it was not helping.  His prescription was changed to Zoloft.  AR 419.

6

1   In February 2010, Plaintiff reported that he had not started Zoloft yet, and his depression was
2   somewhat better.  Plaintiff's treating physician encouraged him to start meds to help with depression
3   symptoms.  AR 418.

4   On June 16, 2010, Plaintiff reportedly stopped taking Zoloft and started Prozac, which helped
5   with depression, but not anxiety in social situations.  AR 417.

6   On February 15, 2011, Plaintiff sought treatment for pain in his wrist, knees and ankle.  AR
7   434.  X-rays of the wrists completed on February 16, 2011, showed findings consistent with a tear of
8   the scapholunate ligament of the left and right wrists, narrowing of the radial scaphoid radiocarpal
9   joints on the right wrist and an ulnar minus variance of the left wrist.  AR 426-427.

10  On February 25, 2011, Plaintiff underwent testing for his complaints of pain in both hands
11  along with numbness and weakness.  The electrophysiological study showed evidence of bilateral,
12  right worse than left, motor, sensory median neuropathy across the wrists suggestive of bilateral
13  moderate to severe, right worse than left, carpal tunnel syndrome with no coexisting evidence of
14  polyneuropathy, myopathy or radiculopathy.  AR 424-425.  Nerve conduction studies of Plaintiff's
15  wrists and elbows were completed on March 10, 2011.  AR 491-492.

16  On March 4, 2011, Plaintiff sought emergency treatment for foot pain and swelling.  X-rays of
17  his left and right foot revealed soft tissue swelling.  AR 520-526.

18  On April 27, 2011, Dr. Tomas Rios, a board certified physician, completed a comprehensive
19  internal medicine evaluation.  Plaintiff's chief complaints included pain in his knees to the ankle area,
20  sleep apnea and bilateral wrist pain.  On physical examination, Plaintiff was identified as obese at 5'9"
21  and 417 pounds.  He walked with a slight limp favoring the left side, but his tandem walk was normal.
22  Examination of both knees revealed crepitation, but no effusion.  There was some tenderness on
23  palpation of the medial compartment bilaterally, but no collapsing weakness.  Plaintiff's wrists were
24  negative for Tinel's and Phalen's signs.  His fine and gross finger manipulations appeared preserved.
25  His strength was 5/5 throughout with normal muscle bulk and tone.  Dr. Rios diagnosed Plaintiff with
26  degenerative joint disease, sleep apnea syndrome, and carpal tunnel syndrome suspect.  Dr. Rios
27  opined that Plaintiff could stand and walk up to six hours and sit up to six hours.  He could lift and
28  carry 50 pounds occasionally and 25 pounds frequently.  He frequently could climb, balance, stoop,

7

kneel, crouch and crawl.  He also could frequently reach, handle, finger and feel.  He had no workplace environmental limitations.  AR 447-451.

On May 1, 2011, Dr. Gil Schmidt, a psychologist, completed a comprehensive psychiatric evaluation.  Upon initial greeting in the lobby, Plaintiff's behavior, mood and gait all appeared within normal limits.  Plaintiff's chief complaints included anxiety, bipolar, depression, hearing voices, physical pain and stress.  Plaintiff reported that he did not like being around anyone and had moody thoughts that caused mood swings.  He had gained 150-200 pounds in the last 10 years and currently weighed 417.  Plaintiff indicated that he began taking psychiatric medication in 2004.  After losing his last job as a forklift operator, he became depressed and sought treatment from his primary care physician.  He reported no significant side effects from any medications and had tried Lexapro, Zoloft and Prozac.  In 2004, he also attended drug and alcohol counseling.  Additionally, Plaintiff reported a psych hospitalization in 2010, a 5150 for drinking alcohol and taking Prozac together.  He also started talking to himself, became agitated and was put into a program for 24-hour observation.  Plaintiff indicated that he last worked in 2007, and quit because people get him upset and comment on his weight.  He has worked as a forklift operator, packing warehouseman and cook.

When describing his activities of daily living, Plaintiff reported he showered on a daily basis, can prepare and cook his own meals and can take care of his own hygiene.  He sleeps from 9-10 hours at a time with repeated awakenings due to sleep apnea.  He does not need to take naps and he denied insomnia, early awakening and repetitive nightmares.  He is capable of both light and heavy duty domestic chores only limited by his excessive weight.

On mental status examination, Plaintiff made appropriate eye contact, his gait appeared slow due to excessive weight and his energy was within normal limits.  His attitude was negative, but he was pleasant, cooperative and responsive to exam questions.  His stream of mental activity/speech was within normal limits as to pace, volume and inflection.  His content of thought was within normal limits.  Dr. Schmidt indicated that while Plaintiff reported auditory hallucinations, he also reported experiencing demonic voices outside of his room, which were much more prominent when he was doing drugs and it had been over a year since he last experienced it.  His affect was congruent and spontaneous with smiles, his mood was within normal limits and he did not appear overly anxious.

Plaintiff's long-term, short-term and working memory appeared intact and functional. His fund of knowledge was within normal limits and he could perform simple daily money calculations. Plaintiff's concentration was within normal limits, he demonstrated an adequate range of affect of expression and appropriate social cueing, his responses suggested cognitive thinking intact at the concrete level of reasoning and his judgment/insight appeared average.

Following examination, Dr. Schmidt opined that Plaintiff's functional level appeared to be adequate with no significant mental health impairment. He diagnosed Plaintiff with depression, assigned a GAF of 71-80, no significant impairment, and found Plaintiff's degree of mental health functioning to be unremarkable. Plaintiff had no impairment of his work related abilities. Plaintiff's reported psychotic intrusions appeared to be related to his symptoms of past drug abuse. AR 438-444.

A May 4, 2011 x-ray of Plaintiff's left knee showed mild joint space narrowing medially, but was otherwise normal. No acute or other preexisting abnormality was detected. AR 446.

On May 16, 2011, Dr. J. Frankel, a state agency physician, completed a Physical Residual Functional Capacity Assessment form. Dr. Frankel opined that Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, could stand and walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and could push and pull without limitation. He could never climb ladders, ropes or scaffolds, but frequently could climb ramps and stairs. He also occasionally could stoop, kneel, crouch and crawl. He had no manipulative or visual limitations. However, he should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes and hazards. AR 452-456.

On May 30, 2011, PY Klein, PsyD, a state agency consultant, completed a Psychiatric Review Technique form. Dr. Klein opined that Plaintiff's affective disorder (depressive d/o nos) was not a severe impairment. Plaintiff had no restriction of his activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation. AR 459-472.

In September 2011, Plaintiff sought follow-up treatment for his morbid obesity and complaints of knee pain. A review of systems was negative. On examination, Plaintiff had 5/5 motor strength in

his upper and lower extremities and a normal gait.  He was provided naproxen for his knee pain and a referral to elective surgery services for his obesity.  AR 504-507.

On October 5, 2011, Dr. E. Matsuyama, a state agency physician, completed a Physical Residual Functional Capacity Assessment.  Dr. Matsuyama opined that Plaintiff could lift and carry 50 pounds occasionally, 25 pounds frequently, could stand and walk about 6 hours in an 8-hour workday, could sit about 6 hours in 8-hour workday and could push and pull without limitation.  Plaintiff could occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds.  In his assessment, Dr. Matsuyama noted that Plaintiff had EMG testing done on both wrists and was diagnosed as having bilateral moderate to severe carpal tunnel syndrome.  He occasionally could balance, stoop, kneel, crouch and crawl.  He had no manipulative, communicative or environmental limitations, but was limited in his far acuity.  AR 508-515.

On December 22, 2011, Plaintiff reported that he had been denied bariatric surgery and was depressed due to his weight.  His treating physician prescribed Paxil.  AR 562-571.

On March 29, 2012, Plaintiff sought follow-up treatment for his obesity and depression.  Plaintiff reported that he had lost weight with exercise and diet, but had chronic knee pain due to weight.  He identified little improvement with Paxil and began taking some old lithium pills believing they would help with his depression.  Plaintiff's treating physician advised him to stop taking the lithium, gave him the number for mental health services and increased his Paxil.  AR 547-556.

On April 30, 2012, Plaintiff underwent an evaluation by Veronica De Alba, a licensed clinical social worker with Fresno County Mental Health.  He reportedly was referred for services because he was struggling with auditory hallucinations, paranoia and depression.  Ms. De Alba diagnosed Plaintiff with a psychotic disorder, NOS, and opined that he had a significant impairment requiring mental health treatment.  Ms. De Alba also opined that Plaintiff was impaired in his living arrangements, employment, daily activities, social relationships and health.  AR 539-541.

On May 30, 2012, Dr. Robert T. Ensom conducted a Psychiatric Evaluation based on Plaintiff's complaint that he always hears voices, which make derogatory statements.  On mental status exam, Plaintiff's affect was appropriate, but his mood was depressed and anxious.  His speech was normal and his thought processes were intact.  Plaintiff reported auditory hallucinations, along

with rare instances of tactile hallucinations, like a mouse crawling on him or tasting pee he thought his family put in his food.  He had persecutory delusions, with mild impaired judgment.  Dr. Ensom diagnosed Plaintiff with a psychotic disorder, NOS.  AR 536-538.

On June 13, 2012, Plaintiff saw Dr. Ensom for medication management.  Plaintiff reported taking Prolixin and feeling "real nervous" in his arms and legs.  The second day, it was intolerable and he stopped taking Prolixin.  On mental status, Plaintiff's behavior, speech, sensorium and affect were within normal limits.  It was noted that Plaintiff's hearing of severe voices caused relational conflict. AR 535.

On June 27, 2012, Plaintiff saw Dr. Ensom for medication management.  Plaintiff reported very little improvement in restlessness and did not want to take Prolixin or go outside.  On mental status, his behavior, speech, sensorium and affect were within normal limits.  Dr. Ensom stopped Prolixin, increased Paxil and prescribed Geodon.  AR 534.

On July 11, 2012, Plaintiff saw Dr. Ensom for psychiatric medication follow-up.  Plaintiff reported that his restlessness was better with his current medications.  Although he still heard auditory hallucinations from family members and neighbors, which woke him with voices and tugging on his shirt, sometimes demonic, it was less.  On mental status, Plaintiff's behavior, speech, sensorium and affect were within normal limits.  His medications included Geodon, Paxil and Cogentin.  AR 533.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 9-18.  More particularly, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since June 30, 2009, his alleged onset date.  AR 11.  Further, the ALJ identified obesity, obstructive sleep apnea, ligament tear of the right wrist and depressive disorder as severe impairments.  AR 11.  Nonetheless, the ALJ determined that the severity of Plaintiff's impairments did not meet or exceed any of the listed impairments.  AR 12-13.  Based on his review of the entire record, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, sit or stand and walk for six hours in an eight-hour workday, never climb ladders, ropes, or scaffolds and frequently balance, stoop, kneel, crouch, crawl and climb ramps or stairs.  He could perform simple

repetitive tasks, but must avoid even moderate exposure to fumes, dusts, odors, gases and poor ventilation.  AR 13-16.  The ALJ found that Plaintiff could not perform any of his past relevant work, but could perform jobs that exist in significant numbers in the national economy.  AR 17-18.  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  AR 18.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commission's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

1  burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

2  1990).

3         In his opening brief, Plaintiff contends that the ALJ erred in (1) his RFC assessment, (2)

4  evaluating the opinion of Plaintiff's treating psychiatrist, and (3) evaluating the non-medical source

5  statement of Plaintiff's mother.

6                              **DISCUSSION**[2]

7  **1.    The ALJ Properly Determined Plaintiff's RFC**

8         Plaintiff argues that the ALJ's RFC assessment failed to fully address Plaintiff's manipulative

9  limitations.   RFC is an assessment of an individual's ability to do sustained work-related physical and

10  mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

11  week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only functional

12  limitations and restrictions which result from an individual's medically determinable impairment or

13  combination of impairments.  SSR 96-8p.  "In determining a claimant's RFC, an ALJ must consider

14  all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects

15  of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"

16  *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96-8p).

17         Plaintiff first contends that the ALJ failed to explain why he rejected the manipulative

18  limitations of frequent reaching, handling, fingering and feeling, which were identified by Dr. Rios.

19  (Doc. 20 at 10.)  In this instance, the Commissioner contends that the ALJ "inadvertently omitted" the

20  ability to "frequently reach, handle, finger, and feel" in the RFC determination and the relevant

21  hypothetical posed to the VE, but such error was harmless.  (Doc. 21 at 16.)

22         Contrary to the Commissioner's assertion, the ALJ's omission was not inadvertent.  As is

23  evident from his opinion, the ALJ tacitly rejected these manipulative limitations.  In particular, the

24  ALJ first considered the 2011 electrophysiological study identifying moderate to severe carpal tunnel

25  syndrome in both wrists, along with x-rays revealing tears of the scapholunate ligaments in both

26

27  [2]      The parties are advised that this Court has carefully reviewed and considered all of the briefs, including
arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or
28  brief is not to be construed that the Court did not consider the argument or brief.

wrists.  AR 14, 424, 426-427.  In considering these medical reports, the ALJ noted that they did not contain opinions that Plaintiff was disabled (AR 14), nor did they identify any correlating functional limitations.  AR 14, 424, 426-427.  The mere presence of a diagnosis in the record is insufficient to establish disability. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of a disability; claimant bears the burden of proving that an impairment is disabling).

The ALJ next considered the opinion of examining physician, Dr. Rios, who concluded that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently and could frequently reach, handle, finger and feel.  AR 14, 447-451.  The ALJ assigned "some limited weight" to Dr. Rios' opinion, but reduced Plaintiff's lifting and carrying capacity "given his complaints of wrist pain."  AR 15.  This reasoning demonstrates the ALJ's implicit rejection of other limitations identified by Dr. Rios related to the condition of Plaintiff's wrists, i.e., his restrictions to frequent reaching, handling, fingering and feeling.  AR 15.

As Plaintiff admits, Dr. Rios reportedly lacked the benefit of Plaintiff's EMG and x-rays showing carpal tunnel syndrome and tearing of the scapholunate ligaments.  (Doc. 20 at 10, 11.) However, Plaintiff's assertion that the ALJ relied on a medical opinion that did not take into account objective evidence of carpal tunnel syndrome is incorrect.  In this case, the nonexamining state agency physician, Dr. Matsuyama, whose opinion the ALJ assigned some weight, had the benefit of Plaintiff's clinical records.  In assessing Plaintiff's RFC, Dr. Matsuyama expressly acknowledged that Plaintiff had EMG testing done on both wrists and was diagnosed as having bilateral moderate to severe carpal tunnel syndrome.  Even with this clinical evidence, Dr. Matsuyama did not identify any manipulative limitations.  AR 508-515.  When the ALJ rejects the opinion of an examining physician in reliance on the nonexamining physician, "reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).  Here, Dr. Matsuyama had the benefit of Plaintiff's clinical findings, but did not identify any restrictions on reaching, handling, fingering or feeling.  Consistent with Dr. Matsuyama's opinion, the ALJ noted that Dr. Rios found Plaintiff's wrists to be negative for Tinel's

1   and Phalen's signs and his fine and gross finger manipulation was preserved.  AR 14-15, 450.  The

2   ALJ also found that no treating physician had opined that Plaintiff was disabled or that his work-

3   related abilities were impaired.  AR 16.  Additionally, the ALJ relied on Plaintiff's daily activities to

4   discount his complaints of disabling symptoms and limitations, which include the ability to do

5   housework, wash dishes, do laundry, mow the lawn, care for his own personal hygiene, shop, prepare

6   meals and drive.  AR 12, 16.

7        The Court finds that the ALJ did not err in his physical RFC finding related to manipulative

8   limitations.  However, even if the ALJ did err in rejecting the manipulative limitations identified by

9   Dr. Rios, such error is harmless, as the Commissioner suggests, because the outcome would have been

10   the same if those manipulative limitations were included in the RFC and hypotheticals posed to the

11   VE. *See Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007) (finding error harmless where it would not

12   affect the ALJ's ultimate decision); *Stout v. Commissioner*, 454 F.3d 1050, 1055 (9th Cir. 2006) (error

13   harmless if it is nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability

14   conclusion); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be

15   reversed for errors that are harmless.").

16        In this case, the ALJ, in a second hypothetical, asked the VE to consider a worker who was

17   capable of light physical exertion, but could never climb ladders, ropes, or scaffolds, could frequently

18   balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, and must avoid even moderate

19   exposure to fumes, odors, dusts, gasses, and poor ventilation.  The VE testified that such a worker

20   could perform other jobs in the economy, such as packing line worker, garment sorter, and ampoule

21   filler.  AR 49.  Of these jobs, both garment sorter and ampoule filler are consistent with the ability to

22   frequently reach, handle, finger and feel.  According to the Dictionary of Occupational Titles, a

23   garment sorter job (DOT No. 222.687-014) requires frequent reaching, frequent handling and

24   occasional fingering, but does not involve feeling.  Similarly, an ampoule filler job (DOT No.

25   559.685-018) requires frequent reaching and frequent handling, but does not involve fingering or

26   feeling.  Accordingly, even though the ALJ omitted Dr. Rios' manipulative limitations from the

27   second hypothetical, the outcome would have been the same; that is, Plaintiff retained the residual

28

1   functional capacity, with manipulative limitations, to perform jobs that exist in significant numbers in

2   the national economy, such as garment sorter and ampoule filler.  AR 17-18.

3   **2.     The ALJ Properly Evaluated the Opinion of Plaintiff's Treating Psychiatrist**

4          Plaintiff contends that the ALJ improperly evaluated the opinion of Dr. Ensom, Plaintiff's

5   treating psychiatrist.  (Doc. 20 at 13-14.)

6          Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who

7   treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

8   (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

9   physicians).  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, a treating physician's

10  opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and

11  an examining physician's opinion is entitled to greater weight than a non-examining physician's

12  opinion.  *Id.* Where an examining physician's opinion is uncontradicted by another doctor, the

13  Commissioner must provide "clear and convincing" reasons for rejecting the examining physician's

14  ultimate conclusions.  *Id.* If the examining doctor's medical opinion is contradicted by another doctor,

15  the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion,

16  and those reasons must be supported by substantial evidence in the record.  *Id.* at 830–31. The ALJ can

17  meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical

18  evidence, stating his interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035,

19  1041 (9th Cir. 2008).

20         Notwithstanding the above discussion, an ALJ is not required to accept an opinion of a

21  physician if it is conclusory and not supported by clinical findings.  *Matney v. Sullivan*, 981 F.2d 1016,

22  1019 (9th Cir. 1992).  Additionally, an ALJ is not bound to a medical source's opinion concerning a

23  claimant's limitations on the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th

24  Cir. 1989).  If the record as a whole does not support the medical source's opinion, the ALJ may reject

25  that opinion.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  Items in the

26  record that may not support the physician's opinion include clinical findings from examinations,

27  conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily

28  activities.  *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d

871, 874-75 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600-601 (9th Cir. 1999).

Here, Plaintiff faults the ALJ for failing to credit Dr. Ensom's assignment of a Global Assessment of Functioning (GAF) score of 40.  (Doc. 20 at 13.)  As Plaintiff suggests, the ALJ did not reference Plaintiff's GAF score of 40, which is derived from the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition ("DSM-IV").  Contrary to Plaintiff's assertion, the ALJ's mere failure to mention the GAF score does not render his assessment of Plaintiff's mental RFC deficient. *See Lopez v. Coleman*, No. 1:13-cv-00741-SKO, 2014 WL 3362250, *13 (E.D. Cal. Jul. 8, 2014) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)); *Osburn v. Colvin*, No. 2:12-cv-2875 AC, 2013 WL 6389139, *6 (E.D. Cal. Dec. 6. 2013) (ALJ's failure to discuss the GAF, standing alone, does not render the decision deficient); *Chavez v. Astrue*, 699 F.Supp.2d 1125, 1135 (C.D. Cal. 2009).  A GAF score is a rough estimate of an individual's psychological, social and occupational functioning used to reflect the individual's need for treatment, but does not have any direct correlative work-related or functional limitations.  *See Hughes v. Colvin*, 599 Fed.Appx. 765, 766 (9th Cir. 2015) (citing *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2. (9th Cir. 1998)).

Plaintiff also faults the ALJ for failing to explain the weight given to Dr. Ensom's opinion. (Doc. 20 at 14.)  In this instance, the ALJ summarized and evaluated Dr. Ensom's treatment notes, stating:

> A Turning Point Rural Clinic psychiatric evaluation of May 30, 2012, by Robert T. Ensom, M.D., includes Mr. Navarro's chief complaint "I always hear voices" (Exhibit 21 F, p. 5).  He noted his last cannabis use was 3 years earlier, and last methamphetamine use in 2003 (Exhibit 21 F, p. 5).  He was cooperative with appropriate affect and eye contact.  His mood was depressed and anxious, but his speech and thought processes were normal and intact.  His memory was intact (Exhibit 21 F, p. 6.)  Dr. Ensom diagnosed Mr. Navarro with a psychotic disorder, not otherwise specified (Exhibit 21F, p. 7.) [¶]  Medications were prescribed, and on June 13, 2012, Mr. Navarro had a normal mental status, but was restless as a side effect (Exhibit 21F, p. 4).  Medications were changed and on July 11, 2012, Mr. Navarro's restlessness improved, and auditory hallucinations decreased (Exhibit 21 F, p. 2).  These records do not contain any opinions indicating Mr. Navarro is disabled, but merely report his subjective complaints and suggest treatments.

AR 15.  Based on the discussion and analysis, it is apparent that the ALJ assigned limited weight to Dr. Ensom's opinion, which was contradicted by an examining physician.  The ALJ provided specific

17

and legitimate reasons for assigning less than controlling weight to Dr. Ensom's opinion. Amongst other reasons, the ALJ discounted Dr. Ensom's opinion because his treatment notes contained no opinion that Plaintiff was disabled. AR 15. The opinion of a treating doctor may be appropriately rejected where the treatment notes fail to present "the sort of description and recommendations one would expect to accompany a finding that [the claimant] was totally disabled under the [Social Security] Act"). *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). The ALJ also appropriately discounted Dr. Ensom's opinion because treatment notes revealed that with the use of prescription medication, Plaintiff's mental status was normal, his restlessness improved and his hallucinations decreased. *Odle v. Heckler*, 707 F.2d 349, 440 (9th Cir. 1983) (rejecting disability claim where claimant's impairments were responsive to medications). The ALJ assigned some weight to Dr. Ensom's opinion, crediting the diagnosis of "psychotic disorder, not otherwise specified" and thereafter limiting Plaintiff to simple, routine type work due to his alleged auditory hallucinations and social anxiety. AR 16.

In discounting Dr. Ensom's opinion, the ALJ also considered the opinion of examining physician, Dr. Schmidt. In particular, the ALJ considered Dr. Schmidt's findings regarding Plaintiff's activities of daily living, Plaintiff's report that he had not experienced hallucinations for more than a year and that, on mental status, Plaintiff was fully oriented and his long, short and working memory appeared intact. AR 16, 438-444. Following examination, Dr. Schmidt concluded that Plaintiff's functional level was adequate with no significant mental health impairment and no impairment in any area of mental functioning. AR 15-16, 443-444. "[W]hen an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence'". *See Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). Here, the ALJ assigned slight weight to Dr. Schmidt's conflicting opinion, and, as noted, credited Dr. Ensom's diagnosis when determining Plaintiff's mental RFC. AR 15-16. There is ample medical evidence in the record to support the ALJ's resolution of the differing opinions between the examining and treating physicians, such that his decision is supported by substantial evidence. *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985) (ALJ has the responsibility for resolving conflicts in the record, and a court will not disturb an ALJ's findings if they are supported).

18

1       **3.**      **The ALJ Did Not Commit Reversible Error in Failing to Discuss Lay Witness**

2  **Testimony**

3       Plaintiff contends that the ALJ erred by failing to consider and weigh the written statement of

4  Plaintiff's mother, Patricia Gallardo.  (Doc. 20 at 14-15.)  The Commissioner counters that while the

5  ALJ did not address this third-party statement, any such error was harmless (Doc. 21 at 21.)

6       An ALJ must consider lay witness testimony concerning a claimant's ability to work.  *Bruce v.*

7  *Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting *Stout*, 278 F.3d at 924); 20 C.F.R. §

8  404.1513(d)(4).  "Such testimony is competent evidence and *cannot* be disregarded without

9  comment." *Id.* (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis in original).

10  If an ALJ disregards testimony from a lay witness, the ALJ must provide specific reasons germane to

11  each witness. *Id.*

12       In this instance, the ALJ failed to specifically address the testimony of Ms. Gallardo, who

13  provided a third party function report in September 2011.  According to Ms. Gallardo, Plaintiff

14  prepares meals on a daily basis, watches television, takes care of pets, mows the lawn, does laundry

15  and shops.  He goes outside once or twice a day.  When he goes out, he walks, drives a car or rides a

16  bicycle.  His obesity prevents him from standing for long times and his joints are painful.  His

17  depression stops him from doing a lot of things, including holding down a job.  Plaintiff also uses a

18  CPAP machine to help with sleep.  Plaintiff has no problem with personal care and does not need

19  reminders to take medications or to take care of his personal needs and grooming.  Plaintiff does not

20  feel good about being around people and thinks that everyone is saying things about him.  He does not

21  attend social events.  Ms. Gallardo believed that Plaintiff could not keep a job due to his physical and

22  mental disabilities.  She believed Plaintiff's conditions affected his ability to lift, squat, bend, stand,

23  reach, walk, kneel, stair climb, see, complete tasks, concentrate, use his hands and get along with

24  others.  His obesity made it hard to be physically active and his mental disability made it hard to be

25  around people. AR 340-347.

26       The Commissioner argues that the ALJ did not commit reversible error by failing to address

27  Ms. Gallardo's statements because the ALJ otherwise addressed Plaintiff's identical allegations.  (Doc.

28  21 at 21.)  The Court agrees.

An ALJ's failure to address a lay witness' testimony is harmless if it is inconsequential to the ultimate nondisability determination in the context of the record as a whole. *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012); *see also Tommasetti*, 533 F.3d at 1038; *Carmickle v. Comm'r, Soc. Sec. Admin*, 533 F.3d 1155, 1162 (9th Cir. 2008). That happens when "the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims." *Molina*, 674 F.3d at 1122 (alterations in original) (quoting *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).  Plaintiff has not challenged the ALJ's evaluation of his testimony and credibility.

Here, the Court finds that the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony, which would support the rejection of Ms. Gallardo's matching testimony. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (as amended).  For instance, the ALJ rejected the severity of Plaintiff's asserted symptoms and their alleged effect on function as not entirely consistent with the medical evidence.  AR 16.  As an example, the ALJ relied, in part, on findings of the state agency consultative examiner, Dr. Rios.  AR 15.  Dr. Rios noted that Plaintiff was obese, but not any severe distress and was able to get on and off the examination table.  He walked with a slight limp, but his tandem walk was normal and negative for Romberg.  His knees revealed crepitation, but no effusion or collapsing weakness.  His wrists were negative for Tinel's and Phalen's signs and his fine and gross finger manipulation was preserved.  He also had motor strength of 5/5 throughout with normal muscle bulk and tone.  Dr. Rios found that Plaintiff could stand, sit and walk for up to six hours, could lift and carry 50 pounds occasionally, 25 pounds frequently, and frequently could climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger and feel.  AR 447-451.  The ALJ reduced Plaintiff's lifting and carrying capacity, but properly relied on the medical evidence in assessing Plaintiff's credibility.  *Rollins*, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects"); *Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").  Additionally, the ALJ acknowledged Plaintiff's response to mental health treatment and psychiatric medications.  AR 15.  When assessing credibility, an ALJ

1   properly may consider a physician's report of improvement with medication.  *Morgan v. Comm'r of*

2   *Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

3          The ALJ also properly found that Plaintiff had described daily activities which were not

4   limited to the extent one would expect, given his complaints of disabling symptoms and limitations.

5   AR 16.    The ALJ reasoned that Plaintiff's ability to do housework, tend to all personal needs, shop,

6   prepare meals, and drive, all of which were noted by Ms. Gallardo, were inconsistent with an inability

7   to perform any kind of work.  AR 16.   Activities of daily living are a valid consideration when

8   evaluating a claimant's credibility.  *See Rollins*, 261 F.3d at 857 (allegation of disability undermined

9   by testimony about daily activities); *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th

10  Cir. 2009) (ALJ properly considered claimant's activities in rejecting his credibility).  Also, the ALJ

11  found that Plaintiff's appearance and demeanor while testifying at the hearing were unpersuasive,

12  noting that Plaintiff was pleasant, cooperative and responsive during the course of his testimony.  AR

13  12, 16.  An ALJ may properly consider a claimant's demeanor in evaluating a claimant's credibility.

14  SSR 96-7p ("[i]n instances in which the adjudicator has observed the individual, the adjudicator . . .

15  should consider any personal observations in the overall evaluation of the credibility of the

16  individual's statements"); *Tonapetyan*, 242 F.3d at 1148 (ALJ's credibility determination may be

17  based, in part, on his personal observations); *Thomas v. Barnhart*, 278 F.3d 947, 960 (9th Cir. 2002)

18  (ALJ may consider demeanor in credibility evaluation).

## CONCLUSION

20         Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

21  evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court

22  **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

23  The Clerk of this Court is **DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin,

24  Acting Commissioner of Social Security, and against Plaintiff Corry Flores Navarro.

25  IT IS SO ORDERED.

26      Dated:   **September 11, 2015**          /s/ *Barbara A. McAuliffe*

27                                          UNITED STATES MAGISTRATE JUDGE

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28